# United States Court of Appeals

## For the Eighth Circuit

_____

No. 23-2842

_____

United States of America

*Plaintiff - Appellee*

v.

Najawaun Marcus Quinn, also known as Fat Boy or Fat Boi

*Defendant - Appellant*

_____

No. 23-2885

_____

United States of America

*Plaintiff - Appellee*

v.

Dimetri Alexander Smith, also known as Metri

*Defendant - Appellant*

_____

Appeals from United States District Court
for the Southern District of Iowa - Eastern

_____

Submitted: September 26, 2024
Filed: March 19, 2025
_____

Before COLLOTON, Chief Judge, LOKEN and SHEPHERD, Circuit Judges.

LOKEN, Circuit Judge.

A January 2023 Third Superseding Indictment charged Najawaun Quinn, Dimetri Smith, and three others with 18 counts of racketeering and firearm offenses involving shootings and other racketeering activity while the defendants were associated with the Savage Life Boys Gang ("SLB Gang") in Davenport, Iowa. The other three defendants pleaded guilty. After a lengthy trial, a jury found Quinn guilty of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. § 1959(a)(3) (Count 1); use of a firearm in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count 2); and being a felon in possession of a firearm or ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) (Count 3). It found Smith guilty of two counts of assault with a dangerous weapon in aid of racketeering in violation of 18 U.S.C. §§ 2 and 1959(a)(3) (Counts 8 and 17) and two counts of use of a firearm in relation to a crime of violence in violation of 18 U.S.C. §§ 2 and 924(c)(1)(A) (Counts 10 and 18). The district court denied their renewed motions for judgment of acquittal. See Fed. R. Crim. P. 29.

In these consolidated appeals, Quinn and Smith appeal their convictions and sentences, raising numerous issues. For the following reasons, we conclude the district court[1] committed no reversible error and therefore affirm.

_____

[1]The Honorable Rebecca Goodgame Ebinger, United States District Judge for the Southern District of Iowa.

# I. Background

**A. The Racketeering Statute.** The primary issues on appeal concern the convictions of Quinn and Smith for counts charging Violent Crimes in Aid of Racketeering Activity in violation of 18 U.S.C. § 1959. The statute provides as relevant here:

> **(a)** Whoever . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity . . . assaults with a dangerous weapon . . . against any individual in violation of the laws of any State . . . or attempts or conspires so to do, shall be punished--
>
> > **(3)** for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years . . . .
>
> **(b)** As used in this section--
> > **(1)** "racketeering activity" has the meaning set forth in section 1961 of this title; and
> > **(2)** "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.[2]

---

[2]Section 1959, first enacted in 1984, is part of Chapter 95 of Title 18 of the United States Code, entitled "Racketeering." Chapter 96 of Title 18, first enacted in 1970, is entitled "Racketeer Influenced and Corrupt Organizations," or RICO. Its stated purpose was "to seek the eradication of organized crime in the United States." See § 1961, Statutory Notes. The definition of "enterprise" in Chapter 96, § 1961(4), is the same as the definition in § 1959(b)(2), except it does not include the last clause: "which is engaged in, or the activities of which affect, interstate or foreign commerce." However, an element of the Chapter 96 "prohibited activities" fills that gap by requiring proof that the defendant, through a "pattern of racketeering activity,"

As defined in 18 U.S.C. § 1961(1), "racketeering activity" includes "(A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance . . . (as defined in section 102 of the Controlled Substances Act), which is chargeable under State law and punishable by imprisonment for more than one year . . . ."

**B. The Racketeering Charges.** The Third Superseding Indictment alleged that Quinn and Smith "were members and associates of a criminal organization known as the Savage Life Boys Gang ('SLB Gang'), whose members and associates engaged in acts of violence, including acts involving murder and assault, narcotics distribution, and other criminal activities." The Indictment alleged that the SLB Gang was a group of individuals associated in fact that constituted an "enterprise" as defined in § 1959(b)(2) -- "an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise [and] engaged in racketeering activity as defined in [§ 1961(1)]." The Indictment alleged that the violent crimes in aid of racketeering committed by Quinn and Smith were multiple assaults with a dangerous weapon or assaults resulting in serious bodily injuries in violation of § 1959(a)(3).

The Indictment further alleged various "means and methods" by which members participated in the conduct of the enterprise's affairs, which included "agree[ing], plann[ing], and conspir[ing] to commit acts of violence and shootings, including acts involving murder, against Zone Fifth and Black Savage street gang members and associates . . . [and] against drug dealers."

---

took part in the activities of "any enterprise engaged in, or the activities of which affect, interstate or foreign commerce." § 1962(a)-(c). Therefore, we conclude (and have found no case questioning the conclusion) that Supreme Court and circuit court cases interpreting the "enterprise" element in a § 1962 RICO prosecution also apply to this § 1959 prosecution for alleged "violent crimes in aid of racketeering activity."

Count 1 alleged that Quinn "for the purpose of maintaining and increasing position in the SLB Gang . . . did commit an assault with a dangerous weapon on R.A., in violation of Iowa Code, Sections 708.6(1), 708.1(2)(c), and 708.2(3)." Count 2 alleged that Quinn knowingly used and discharged a firearm during the assault charged in Count 1.

Counts 8 and 17 alleged that Smith "for the purpose of maintaining and increasing position in the SLB Gang" assaulted L.G. and B.P. with a dangerous weapon "in violation of Iowa Code, Sections 708.6(1), 708.1(2)(c), 708.2(3), 703.1, and 703.2." Counts 10 and 18 alleged that Smith knowingly used and discharged a firearm during the assaults charged in Counts 8 and 17.

## II. Sufficiency of the Evidence Issues

Quinn and Smith argue the district court erred when it denied their renewed motions for judgment of acquittal on the racketeering charges because the evidence was insufficient to prove they were members or associates of an "enterprise," as defined in § 1959(b)(2), that they "engaged in racketeering activity," as defined in §§ 1959(b)(1) and 1961(1), and that they committed the alleged racketeering crimes "for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity" in violation of § 1959(a).

**A. The Standard of Review.** In reviewing the district court's denial of a motion for judgment of acquittal, we "view the evidence in the light most favorable to the guilty verdict [and] grant[] all reasonable inferences that are supported by that evidence." United States v. Waln, 916 F.3d 1113, 1115 (8th Cir. 2019) (quotation omitted). "The standard of review is 'very strict,' and we will reverse a conviction only if we conclude that no reasonable jury could have found the accused guilty beyond a reasonable doubt." United States v. Nolen, 536 F.3d 834, 842 (8th Cir.

2008) (quotation omitted); see United States v. Henderson, 11 F.4th 713, 715 (8th Cir. 2021), cert. denied, 142 S. Ct. 1696 (2022).

Applying this standard of review to the § 1959(a)(3) convictions in this case requires a summary of the extensive evidence presented at trial, viewed in the light most favorable to the jury's verdict.  At trial, approximately two dozen witnesses testified about the SLB Gang, gang members' involvement, and specific criminal incidents we will summarize below. SLB members testified about the gang's culture, norms, purposes, use of weapons, mutual expectations that members retaliate when disrespected, and commitment to support each other in retaliating against rival gang members and others.

**B. The Trial Evidence.**  The SLB Gang was formed in Davenport around 2009 after its founding members, including Quinn and Smith, split off from the 12th Street Gang.  SLB's members had their own distinct hand sign and gang tattoos.  On social media websites and apps, members posted content with the hashtags "DDG" (for Dae Dae Gang), "SLB," or "1200."  These posts praised the gang, disparaged rival gang members, paid tribute to dead SLB members, flashed gang signs and images flaunting money, and exhibited SLB members in rival gang territory as a form of "tagging."  Some members retained ties to other gangs.

SLB members engaged in many illicit practices.  They violently feuded with other gangs, including Zone Fifth, a gang from Rock Island, Illinois.  This rivalry escalated after two SLB members were killed.  SLB members earned money by gambling, committing robberies, and selling drugs, which earned respect.  Members, including Quinn and Smith, used social media to advertise and arrange drug sales. Some shared customers and allowed other members to sell to their customers if they ran out of drugs.  SLB members used one customer's apartment as a hangout and exchanged drugs for a Ford Explorer used in various shootings.  With drug profits,

members bought guns. They also stole guns, shared guns, and helped hide "hot" guns used in shootings.

The SLB Gang did not have written rules, but members abided by customs and expectations. Members supported other members who were incarcerated by putting money in their commissary accounts and providing financial help after release from prison. Members were instructed not to cooperate with law enforcement; cooperation could lead to being disowned from the gang. Members were expected to assist each other by fighting members of other gangs, which preserved the Gang's strength and respect. They shared information regarding rival gangs for retaliation. If someone showed disrespect, SLB members would "beat his ass" or "shoot at him." Members regarded respect as "the only thing there is [and] if you lose it, that can be pretty devastating." Respect and a member's position within the gang were linked to his willingness to commit acts of violence, including fighting and shooting. Refusal could lead to a member being disowned.

In October 2016, members of the 12th Street Gang thought Quinn burglarized the home of R.A., a 12th Street member. Quinn and R.A. exchanged hostile messages in which R.A. disrespected Quinn and threatened to fight or shoot him. On October 9, a witness identified Quinn as the person who shot at the residence of the sister of R.A.'s significant other. A trial witness identified Quinn as a passenger in a vehicle on October 12 when another SLB passenger shot at a vehicle occupied by someone with whom the SLB shooter was feuding. On October 16, Quinn, Smith, and another SLB member drove to R.A.'s house and stopped nearby. Quinn approached R.A.'s home, found R.A.'s truck in the driveway, and shot at the vehicle. An exchange of gunfire followed, during which Quinn shot R.A. with the same 9 mm Smith & Wesson gun used in the October 9 and 12 shootings. A witness testified that Quinn returned to his vehicle and announced to the other SLB members, "I think I killed that n****." Quinn was wounded in the gunfight. Before taking him to the hospital, the SLB members dropped off a member to hide the gun and sweatshirt Quinn was

wearing. The shooting on October 16 was the assault with a dangerous weapon in aid of racketeering and use of a firearm charged in Counts 1 and 2.

On January 31, 2017, Smith and two other SLB members encountered two members of the Zone Fifth Gang from Rock Island at the North Park Mall in Davenport. After a brief interaction, Smith and the other SLB members went to their vehicle and drove to the food court entrance. Smith and another member exited the vehicle, ran toward B.P., and discharged their firearms until they were empty. This shooting was the assault with a dangerous weapon in aid of racketeering and use of a firearm in a crime of violence charged in Counts 17 and 18.

In April 2017, L.G., a 17th Street Gang member, robbed a SLB member. On April 22, Smith and defendant Austin Ruiz saw L.G. and another in Centennial Park. Armed with a Glock 19, Ruiz confronted L.G. and a struggle ensued. L.G. was shot in the foot. Smith then placed L.G. in a sleeper-hold until he was unconscious. This incident was the assault with a dangerous weapon in aid of racketeering and use of a firearm in a crime of violence charged against Smith and Ruiz in Counts 8 and 10. Ruiz pleaded guilty and testified as a cooperating government witness at Smith's trial.

During these months, Smith and Quinn were involved in other violent incidents where firearms were discharged. At a dice game on December 16, 2016, Smith gave Ruiz his stolen Taurus 9 mm pistol to confront an individual who owed Ruiz money. Smith got in a fight with another man at the dice game. Ruiz fired a dozen shots at the man as he fled. On February 12, 2017, Quinn and Smith were involved in an altercation with rivals that ended with SLB members shooting at the rivals and into the nearby crowd, killing one person and injuring another. SLB members left together and disposed of their weapons.

**C. Sufficiency Issues.** Quinn and Smith argue the evidence was insufficient because the government failed to prove (1) they were members or associates of an

enterprise engaged in racketeering activity (the SLB Gang) and (2) they committed the alleged crimes for the purpose of maintaining or increasing positions in an enterprise engaged in racketeering activity.

**(1) Was the SLB Gang an Enterprise Engaged in Racketeering Activity?** In Boyle v. United States, the Supreme Court clarified whether, in a prosecution for an alleged violation of 18 U.S.C. § 1962(c), RICO requires proof of "an association-in-fact enterprise . . . [that has] an ascertainable structure beyond that inherent in the pattern of racketeering activity in which it engages." 556 U.S. 938, 945 (2009). The Court noted the "obviously broad" definition of "enterprise" in § 1961(4) -- "any union or group of individuals associated in fact although not a legal entity" -- and that the statute "provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" Id. at 944 quoting § 904(a), 84 Stat. 947; see note following 18 U.S.C. § 1961. The Court repeated what it held in United States v. Turkette, 452 U.S. 576, 580, 583 (1981): "an enterprise includes any union or group of individuals associated in fact," and RICO reaches "a group of persons associated together for a common purpose of engaging in a course of conduct." Boyle, 556 U.S. at 944.

Based on the statute's terms, the Court in Boyle concluded that "an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Id. at 946. However:

> an association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods . . . . Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies.

Id. at 948. In United States v. McArthur, we held that "[a]n informal association of individuals constitutes a RICO enterprise when it is 'a continuing unit that functions with a common purpose.'" 850 F.3d 925, 934 (8th Cir. 2017), quoting Boyle, 556 U.S. at 946, 948.

Smith argues there was insufficient evidence of the requisite common purpose because the SLB Gang had no defined structure, no initiation, no leadership, no written rules, no organization that conducted drug sales, and no requirement to engage in violence. The only common purpose, he suggests, was to be "wild," "ungovernable," and "violent." He further argues there was no continuity of structure because there were no defined roles and no group hierarchy beyond the structure inherent in the alleged violent criminal acts. We disagree.

The trial evidence permitted a reasonable jury to find that the SLB Gang met the Boyle test for an enterprise at the times Quinn and Smith committed the violent assault crimes. The group of original members created the SLB Gang after splitting off from another gang and reserved membership for those chosen by the existing members. The group identified its members through recognizable hand signs, specific tattoos, and social media posts designed to demonstrate distinct affiliation in competition with other groups. Unique relationships existed among SLB members as they feuded with rival gangs, protected each other, and extolled the reputations of other members -- both living and killed by other gangs. These relationships were the bedrock of the Gang's unwritten expectations -- that members would not cooperate with law enforcement; should perform disrespectful acts toward other gangs; and should respond to disrespect with violence.

SLB members engaged in activities that demonstrated a "common purpose" -- supporting incarcerated members financially; posting photos of members flashing the gang's hand signs with stacks of money when most members lacked jobs other than selling drugs and stealing; promoting their shared drug trafficking on social media to

enhance the Gang's reputation; using drug profits to purchase guns used in a host of violent incidents in which the group protected members and their reputations and assaulted or retaliated against rival gangs or individuals who disrespected the group. As we said in McArthur:

> The Mob had several purposes: Members worked to promote the Mob, develop its reputation, and protect its territory and members. . . . For nearly two decades, the Mob operated as a coherent unit. Many members joined the Mob as teenagers and were in the gang for several years. The Mob had meetings, colors, signals, and symbols. Both written and unwritten rules governed members' behavior. When a member violated one of the rules, Mob leaders meted out punishment, often in the form of a physical assault at the hands of other members. The Mob also used a hierarchical leadership structure, and when one leader stepped down, another member was selected for the role.

850 F.3d at 934; see United States v. Green, 104 F.4th 12, 14 (8th Cir. 2024) ("[A] 'common purpose' . . . was getting money through selling drugs, both together and individually . . . [and] attacking rivals, which involved carrying a gun with a bullet in the chamber, looking for [rivals], and shooting at them.").

Smith argues there were key differences between the SLB Gang and the enterprise at issue in McArthur -- the SLB Gang had neither a hierarchy with positions nor written rules. But "[a]ll that matters is that [the SLB Gang] had 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue [its] purpose.'" Green, 104 F.4th at 14, quoting Boyle, 556 U.S. at 946.

Quinn and Smith argue the government's evidence was insufficient to prove the existence of a § 1959(b)(2) "enterprise" under United States v. Crenshaw, where we "identified three characteristics which an enterprise must have: a common purpose shared by the individual associates; some continuity of structure and personnel; and

structure distinct from that inherent in the racketeering activity alleged." 359 F.3d 977, 991 (8th Cir. 2004). But in Boyle, a more recent case defining the enterprise element of a § 1962(c) prosecution, the Supreme Court rejected the contention that an "association-in-fact enterprise" must have hierarchical structure, a chain of command, and members with fixed roles. Though enterprise is a separate element the government must prove through evidence of "structural features" and a common purpose, the "pattern of racketeering activity and the evidence establishing an enterprise may in particular cases coalesce." 556 U.S. at 946-47 (quotation omitted). Likewise, in a § 1959 prosecution, evidence sufficient to prove the "racketeering activity" and "enterprise" elements may coalesce. Here, the trial evidence was sufficient for a reasonable jury to find that the SLB Gang was a § 1959(b)(2) racketeering "enterprise."

**(2) Did Defendants Commit the Violent Assault Offenses to Maintain or Increase Position in the Enterprise?** To prove the charged § 1959(a)(3) violent assault crimes, the government had to prove that each defendant "was motivated by maintaining or increasing his position in the racketeering enterprise," but "need not show that it was his sole or principal motive." United States v. Henley, 766 F.3d 893, 910 (8th Cir. 2014) (quotation omitted), cert. denied, Peteet v. United States, 574 U.S. 1200 (2015); accord United States v. Banks, 514 F.3d 959, 965 (9th Cir. 2008), and cases cited. Quinn and Smith each argue the government failed to prove they violated § 1959(a)(3) because there was insufficient evidence they committed the violent assaults for the purpose of maintaining or increasing "position" in the alleged enterprise, the SLB Gang. Because there was no hierarchical structure and no leadership roles, they argue their violent acts were undertaken personally, not to advance position within or to aid the SLB Gang.

We agree with the district court that § 1959(a) "does not say 'a position.' The statute at issue involves increasing position. Position can mean a relative place, situation, or standing." The enterprise need not have hierarchy, roles, or complex

structure; there are "no such requirements in RICO." Boyle, 556 U.S. at 948-49. The jury heard testimony that violent acts were key to membership and securing respect in the SLB Gang. Given the value the gang placed on a member's willingness to respond violently to disrespect, a reasonable jury could find that the violent assaults committed by Quinn and Smith against rival gang members and others were acts done to preserve status -- "position" -- within the Gang. "In reviewing a challenge to the sufficiency of the evidence . . . a jury's credibility determinations are virtually unreviewable." United States v. DeFoggi, 839 F.3d 701, 712 (8th Cir. 2016) (cleaned up), quoting Henley, 766 F.3d at 905.

### III. Jury Instruction Issues

The district court overruled a number of timely objections by Quinn and Smith in fashioning its jury instructions on the racketeering offense charges. On appeal, Quinn and Smith argue the court committed reversible instruction errors. Our standard of review is clear. "We review challenges to jury instructions under a deferential abuse of discretion standard and will not find error when the jury instruction fairly and adequately submitted the issue to the jury." United States v. Wilkins, 25 F.4th 596, 600 (8th Cir. 2022) (quotation omitted). "[R]eversal of a conviction is warranted only if the district court's alleged erroneous failure to give a particular instruction was prejudicial." United States v. Whitehead, 176 F.3d 1030, 1037 (8th Cir. 1999). The defendant "is not entitled to a particularly-worded instruction when the instructions actually given by the trial court adequately and correctly cover the substance of the requested instruction." United States v. Cruz-Zuniga, 571 F.3d 721, 725 (8th Cir. 2009) (quotations omitted).

**A. The Enterprise Instruction.** Quinn and Smith requested a jury instruction defining the "enterprise" element of a § 1959(a) offense based on the three-prong test we set forth in Crenshaw. Instead, the district court adopted an instruction that

-13-

approximated the <u>Boyle</u> test and aligned with Eighth Circuit Model Jury Instruction (Criminal) 6.18.1962D (2023):

> The term "enterprise," as used in these instructions, may include a group of people associated in fact, even though this association is not recognized as a legal entity. A group or association of people can be an enterprise if these individuals have joined together for the purpose of engaging in a common course of conduct. This group of people, in addition to having a common purpose, must have personnel who function as a continuing unit. This group of people does not have to be a legally recognized entity, such as a partnership or corporation. Such an association of individuals may retain its status as an enterprise even though the membership of the association changes by adding or losing individuals during the course of its existence.
>
> It is not necessary that the enterprise have any particular or formal structure, but it must have sufficient organization that its members functioned and operated in a coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise. . . .

On appeal, Smith argues this instruction did not sufficiently require the jury to find that the enterprise, the SLB Gang, had a "continuity of structure." Applying the governing law in <u>Boyle</u> and cases applying <u>Boyle</u>, we disagree. "Although an association-in-fact enterprise must have . . . structural features, it does not follow that a district court must [even] use the term 'structure' in its jury instructions. A trial judge has considerable discretion in choosing the language of an instruction so long as the substance of the relevant point is adequately expressed." <u>Boyle</u>, 556 U.S. at 946. The provided instructions properly encapsulate the law defining "enterprise," and we will not disturb the jury's verdict based on those instructions. The district court's enterprise instruction "fairly and adequately submitted the issue to the jury." <u>Wilkins</u>, 25 F.4th at 600.

-14-

**B. The Attempted Murder Instruction.** A violation of § 1959(a)(3) requires proof that the defendant committed the alleged assault "for the purpose of gaining entrance to or maintaining or increasing position in *an enterprise engaged in racketeering activity*," as that term is defined in § 1961(1) (emphasis added); subsection (1)(A) of that lengthy statute includes "any act or threat involving murder . . . robbery . . . or dealing in a controlled substance." In this case, the district court instructed the jury:

> "Racketeering activity" means . . . the following crimes, as alleged in the Indictment:
>
> 1. Offenses involving . . . dealing in controlled substances in violation of federal law;
>
> 2. Acts involving murder in violation of the laws of the State of Iowa; or
>
> 3. Acts involving robbery in violation of the laws of the State of Iowa.

The following three instructions then defined the elements of these crimes. At an instructions conference near the end of the government's case in chief, the government urged the court to add to the Iowa murder instruction the crime of attempted murder, based on our decision in United States v. Haynie "that inchoate offenses of attempt and conspiracy to commit an enumerated offense that would be racketeering activity require an act 'involving' the enumerated offense." 8 F.4th 801, 805 (8th Cir. 2021) (citations omitted). Overruling defendants' objections, the district court included the elements of the crime of attempted murder in the final Iowa murder instruction. The court concluded that the indictment and the evidence presented at trial gave Quinn and Smith sufficient notice that the alleged "racketeering activity" included acts or threats involving attempted murder.

-15-

On appeal, Quinn and Smith argue the district court erred in denying their post-verdict motions for new trial because inclusion of the crime of attempted murder in the jury instruction was a material variance from the Third Superseding Indictment and they were "prejudiced by the last-minute insertion of this crime into Final Jury Instruction No. 20." Unlike a constructive amendment, which changes the charge while the evidence remains the same, "a variance changes the evidence, while the charge remains the same." United States v. Woods, 978 F.3d 554, 569 (8th Cir. 2020) (quotation omitted). Here, the argument on appeal appears to be, in essence, a constructive amendment argument, which would be reversible error *per se*.

We agree with the district court there was no constructive amendment. The Third Superseding Indictment alleged that Quinn and Smith were members and associates of the SLB Gang, "an enterprise engaged in racketeering activity," and that members and associates committed "acts of violence and shootings, including acts involving murder," against members of other gangs and drug dealers. Applying our holding in Haynie that attempts to commit an enumerated racketeering offense require one or more acts "'involving' the enumerated offense," attempted murder "is conduct within the scope of the indictment." United States v. Harris, 344 F.3d 803, 805 (8th Cir. 2003), cert. denied, 540 U.S. 1201 (2004).

We likewise agree there was no material variance between the indictment and the proof at trial. "A variance between the indictment and proof at trial requires reversal of a conviction only if the variance actually prejudiced the defendant. The primary consideration in this determination is whether the indictment fully and fairly apprised the defendant of the charges he or she must meet at trial." United States v. Thomas, 791 F.3d 889, 897 (8th Cir. 2015) (quotation omitted). "A variance that does not result in actual prejudice to the defendant is harmless error, and does not require reversal of the conviction." United States v. Stuckey, 220 F.3d 976, 979 (8th Cir. 2000).

-16-

Quinn argues he was prejudiced because there were no charges of attempted murder in the indictment. But allegations that the SLB members committed "acts of violence and shootings, including acts involving murder" were allegations that the SLB Gang was "an enterprise engaged in racketeering activity," an element of the government's case, and therefore "fully and fairly apprised [Quinn and Smith] of the charges [they]. . . must meet at trial." United States v. Brown, 330 F.3d 1073, 1078 (8th Cir.), cert. denied, 540 U.S. 975 (2003). The government's trial evidence then confirmed that "acts involving murder," which include acts of attempted murder, was one type of racketeering activity the government was attempting to prove. There was no material variance and no actual prejudice to either defendant.

**C. The Purpose To Maintain Position Instruction.** Smith next contends the district court improperly instructed the jury on the government's need to prove that his actions were "for the purpose of . . . maintaining or increasing position in an enterprise . . . ." § 1959(a). The district court instructed:

> The fifth element which the Government must prove beyond a reasonable doubt as to Counts 1, 8, and 17 is that the purpose in committing the assault with a dangerous weapon alleged in those Counts was to maintain or increase position in the enterprise. The Government is not required to prove that this was the sole or principal motive.

> In determining whether the purpose in committing the assault with a dangerous weapon as alleged in Counts 1, 8, and 17 was to maintain or increase position in the enterprise, you should give the words "maintain" and "increase" their ordinary meanings. You should consider all of the facts and circumstances in making that determination.

> For example, you may consider evidence that the crime, if proved, was committed to maintain discipline within the enterprise and served to maintain position in the enterprise. If the Defendant at issue committed the crime because he knew it was expected of him by reason of his membership in the enterprise, or if he committed the crime

because he thought it would enhance his position or prestige within the enterprise, or if he committed it because he thought it was necessary to maintain the position he already held, or to help someone else maintain or increase their position within the enterprise, this element would be established. These examples are only meant by way of illustration. They are not exhaustive.

Smith argues this instruction left the definition too "open ended" because the phrase "maintaining or increasing" was undefined beyond a series of examples to consider in determining the phrase's "ordinary meanings." This prevented him, Smith suggests, from arguing he had no position within the SLB Gang. Although Smith had proposed an instruction defining "purpose," he failed to object to the court's proposed instruction at the instructions conference, stating he had no objections to the proposed instructions aside from the definition of enterprise. "Where a party fails to timely object to an instruction at trial . . . we review only for plain error." United States v. Sledge, 108 F.4th 659, 666 (8th Cir. 2024) (quotation omitted).

We have repeatedly rejected the premise that providing proposed instructions meets the requirements of objecting. See, e.g., id. at 666. Here, we need not decide whether our standard of review is for plain error or abuse of discretion because Smith's challenge fails under either standard. The district court properly instructed the jury to give the words "maintain" and "increase" their ordinary meanings, considering all facts and circumstances in making that determination. "[I]t is typically not necessary to define a particular term in the jury instructions if the meaning being attributed to that term is a matter of common knowledge." United States v. Poitra, 648 F.3d 884, 887 (8th Cir. 2011) . Boyle made clear that the SLB Gang need not have a defined hierarchy with member roles to be a racketeering enterprise. Thus, the word "position" defied more precise definition, and the district court's common sense examples were a sound way to assist the jury in making this determination. There was no abuse of discretion and certainly no plain error.

-18-

# IV. Sentencing Issues

**A. Quinn's Sentencing.** At Quinn's sentencing, the district court determined that the Base Offense Level is 33 under USSG § 2A2.1(a)(1) because the object of Quinn's assault in aid of racketeering offense "would have constituted first degree murder." Citing "overwhelming" evidence of attempted first degree murder, the court rejected Quinn's argument that the base offense level should be 27 under § 2A21.(a)(2) because his actions did not constitute first degree murder. This determination resulted in an advisory guidelines range of 412 to 480 months imprisonment. After considering the 18 U.S.C. § 3553(a) sentencing factors, the court varied downward and imposed a 408 month sentence.

Quinn appeals, arguing the district court erred in increasing his base offense level based on the attempted first degree murder guideline, which defines first degree murder as "conduct that, if committed within the . . . territorial jurisdiction of the United States, would constitute first degree murder under 18 U.S.C. § 1111." USSG § 2A2.1, comment. (n. 1). "We review the district court's application of the sentencing guidelines de novo and its factual findings for clear error." United States v. Manning, 106 F.4th 796, 801 (8th Cir. 2024) (quotation omitted).

"Every murder . . . perpetrated by . . . any . . . kind of willful, deliberate, malicious, and premeditated killing . . . is murder in the first degree." 18 U.S.C. § 1111(a). "In other words, it requires the specific intent to kill." United States v. Greer, 57 F.4th 626, 629 (8th Cir. 2023); see Braxton v. United States, 500 U.S. 344, 351 n.* (1991) ("[A]n attempt to commit murder requires a specific intent to kill."). "Applying clear error review, we will reverse only if the entire record definitely and firmly illustrates that the lower court made a mistake in finding the malice aforethought and premeditation required for attempted first degree murder." Greer, 57 F.4th at 629 (quotation omitted).

Quinn was convicted of the assault in aid of racketeering charged in Count 1, which alleged that he "did commit an assault with a dangerous weapon on R.A., in violation of Iowa Code, Sections 708.6(1), 708.1(2)(c), and 708.2(3)." The trial evidence viewed in favor of the jury's verdict established that, during an ongoing dispute with R.A., Quinn received disrespectful messages from R.A. after Quinn fired gunshots at a house associated with R.A. Quinn then drove with other SLB Gang members to R.A.'s home, left the vehicle, and fired multiple shots at R.A., who was sitting in a truck in the driveway. One shot hit R.A. in the arm. Quinn returned to the vehicle and exclaimed to the other SLB members that he found R.A. and thought he killed him.

The intent-to-kill element of attempted first degree murder can be proven with circumstantial evidence permitting an inference that the defendant acted with the specific intent to kill. Important categories of circumstantial evidence include facts prior to the shooting that show planned activity, facts about defendant's prior relationship with the victim from which motive can be inferred, and facts which show "that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design." United States v. Crow Ghost, 79 F.4th 927, 936 (8th Cir. 2023) (quotation omitted). The district court did not clearly err in finding that Quinn acted with intent to kill. As the court stated at sentencing, attempted first degree murder "is well supported in the record." See United States v. Conley, No. 21-2094, 2022 WL 2979771, at *2 (8th Cir. July 28, 2022), and cases cited ("Ample case law shows that similar behavior demonstrates specific intent to kill.").

**B. Smith's Sentencing.** Section 3E1.1 of the Guidelines provides for a two-level reduction if the defendant "clearly demonstrates acceptance of responsibility for his offense." Smith argues the district court erred in calculating the advisory guidelines sentencing range by denying Smith's request for a two-level reduction for acceptance of responsibility because, the court concluded, he "did not

-20-

admit to committing the shootings . . . [or] to the actions that were required to be proven by the Government far beyond the existence of the enterprise." See USSG § 3E1.1, comment. (n.2). We will reverse a factual determination whether the defendant accepted responsibility "only if it is so clearly erroneous as to be without foundation." United States v. Petruk, 836 F.3d 974, 978 (8th Cir. 2016) (quotation omitted); see USSG § 3E1.1, comment. (n.5) ("[T]he determination of the sentencing judge is entitled to great deference.").

The acceptance of responsibility "adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." § 3E1.1 comment. (n.2). "It is [therefore] a rare situation where a defendant who contests his guilt at trial can meet his burden to clearly demonstrate acceptance of responsibility." Petruk, 836 F.3d at 977 (quotation omitted). We deny acceptance of responsibility when "[t]here were no stipulations of guilty conduct eliminating factual elements of guilt or limiting trial to a constitutional or statutory challenge." United States v. Field, 110 F.3d 592, 594 (8th Cir. 1997).

The district court denied the reduction because Smith did not, prior to or during trial, reduce the Government's burden to prove every element of the charged offense:

> [A]t no point prior to trial and at no point during trial, were there stipulations or, crucially, acceptance of responsibility on behalf of this defendant. He did not admit to committing the shootings. He did not admit to the actions that were required to be proven by the Government far beyond the existence of the enterprise.
>
> That may have been the focus of the defendant's argument in closing argument, but that was not all that the Government had to prove, and there were no stipulations of fact that would have allowed the Government to focus its case or to present, for example, a stipulation of facts that could then be tried to the Court on the record.

-21-

\* \* \* \* \*

Here, the defendant contested his participation in Savage Life Boys and his -- not only that it was an enterprise. And this is very far afield from the type of case where a defendant goes to trial, maintains a legal objection, and then is demonstrating acceptance of responsibility through some other way. . . . The defendant has failed to meet his burden by a preponderance of the evidence that he is entitled to such a reduction.

At trial, Smith did not merely defend by arguing the SLB Gang was not a racketeering "enterprise," which was an element of his factual guilt of his two § 1959(a)(3) offenses. He did not stipulate guilt for the shootings and argued the jury had to determine whether or not those offenses occurred. In closing argument, he downplayed the violent hotel and park shootings, blamed the park shooting victim for escalating the situation, and claimed the fatal concert shooting was not murder because "[no]body intended to kill somebody." On this record, the district court's factual determination that Smith is not entitled to an acceptance of responsibility reduction is not "so clearly erroneous as to be without foundation."

For the foregoing reasons, the judgments of the district court are affirmed.

_____